NYSA–ILA MEDICAL & CLINICAL SERVICES FUND, By and Through its trustees, James A. CAPO, M. Brian Maher, Richard F. Gronda, David J. Tolan, Ole A. Sweedlund, John Bowers, Albert Cernadas, Frank Lonardo, and Gerald Owens, Plaintiff,

v.

Sabato (a/k/a Sal) CATUCCI, Kevin Catucci, Ronald Catucci, and Keith Catucci, Defendants.

No. 96 CIV. 477(CBM).

United States District Court, S.D. New York.

July 30, 1999.

Ernest L. Mathews, Jr., Gleason & Mathews, New York, NY, Ann Marie Flynn, Lambos & Young, New York, NY, for Plaintiff.

Gareth W. Stewart, New York, NY, for Defendants.

## OPINION

MOTLEY, District Judge.

Plaintiff, an employee medical services fund, claims that defendants controlled Salco Trucking Corporation and wrongfully withheld that corporation's payments to the fund. In a prior action, plaintiff won a judgment holding the corporation liable for delinquent contributions to the fund. In the present action, plaintiff seeks to hold defendants liable for their role in the Salco delinquency, alleging that each defendant acted as the corporation's alter ego (Count I), breached fiduciary duties to the fund (Count II), and embezzled fund assets (Count III). Defendants responded with a counterclaim for attorney's fees.

Defendants have moved for summary judgment and plaintiffs have cross-moved for partial summary judgment. For the reasons given below, the court grants in part and denies in part both parties' motions. As to defendant Sabato Catucci, the court grants plaintiff summary judgment on Count II, grants defendant summary judgment on Count III, and denies both parties summary judgment on Count I. As to defendants Kevin Catucci, Keith Catucci, and Ronald Catucci, the court grants defendants summary judgment on all counts.

I. Background

Unless otherwise indicated, the following facts are undisputed, with citations to any

pleading also referring to the opposing party's admission of the cited facts.

## A. The Fund

Plaintiff NYSA–ILA Medical & Clinical Services Fund ("Fund") provides funding for medical clinics serving longshore employees (and retirees, dependents, and others) as a multiemployer benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), §§ 3(3), 3(37), 4, 29 U.S.C. §§ 1002(3), 1002(37), 1003. Compl. ¶ 4. The Fund is a jointly administered labor-management trust fund established in collective bargaining agreements (CBAs) between the New York Shipping Association, Inc. ("NYSA") and the International Longshoremen's Association, AFL–CIO ("ILA") in accordance with the Labor Management Relations Act ("LMRA"), § 302(c)(5), 29 U.S.C. § 186(c)(5). Compl. ¶ 4. CBAs between Salco Trucking Corporation ("Salco"), a now-bankrupt trucking company, and an ILA local union are the source of the disputed Salco obligations to the Fund. *Id.* ¶¶ 7–9.

## B. Salco and the Catuccis

Salco was incorporated in 1970, with ownership and control split between Sabato (a/k/a Sal) Catucci and Reuben Coher. Epstein Aff., Ex. B. On February 1, 1974, Sabato Catucci gained sole ownership and control when Reuben Cohen resigned as officer and director, transferring his 50 percent interest to Sabato Catucci. *Id.* Salco then became a family business, with all shares and corporate offices held by Sabato Catucci, his sons Kevin Catucci and Keith Catucci, and his brother Ronald Catucci. Sabato Catucci, maintaining a controlling interest, ran Salco and made all decisions on its payments. Pl.'s R. 3(g) Stmt. ¶¶ 7–8. From February 1, 1974 to January 5, 1988, Sabato Catucci was the sole shareholder and principal, owning all 200 shares of stock. On January 5, 1998, he transferred a 96–share minority interest to his sons, split 48 shares each for

Kevin Catucci and Keith Catucci. *Id.* ¶ 5. A shareholder meeting that day elected Sabato Catucci as President, Kevin Catucci as Vice President, Keith Catucci as Secretary/Treasurer, and all three as Directors. *Id.* ¶ 6.

The role of defendant Ronald Catucci is a bit murkier. Sabato Catucci testified that Ronald Catucci was Secretary–Treasurer of Salco between 1974 and 1988; no records show any such appointment, however. *Id.* ¶ 12. Sabato Catucci elaborated that Ronald Catucci signed bank papers and procured loans for Salco, but had no say in the company's policies and finances, and essentially served in a "figurehead position" that began before 1988 and continued afterwards. *Id.* ¶ 13. Ronald Catucci testified that he served as Salco's "bookkeeper" at all times since 1977 but did not hold any Salco office, was never a Salco officer, and was not Salco's Treasurer. *Id.* ¶¶ 14–15. At least in the late 1980s, however, Ronald Catucci signed as Treasurer of the corporation on Salco's federal corporation income tax returns, which must be signed by a corporate officer, and on Salco's federal income tax returns. *Id.* ¶¶ 16–18 (federal corporation income tax return covering September 1986 to August 1987; federal income tax returns for 1986, 1987, 1988, and 1989). Ronald Catucci also signed Salco checks bearing notations indicating that they were loan repayments by Salco. *Id.* ¶¶ 27–28.

## C. Salco's Delinquent Contributions to the Fund

Salco failed to make contributions to the Fund that the Fund believed Salco was obligated to make under two consecutive three-year CBAs with effective dates of April 1, 1984 ("1984 CBA") and April 1, 1987 ("1987 CBA"). Compl. ¶ 8. On September 14, 1990, plaintiff filed an action against Salco to recover delinquent contributions, *NYSA–ILA Med. & Clinical Servs. Fund v. Salco Trucking Corp.*, 90 Civ. 5949(CSH) (S.D.N.Y.) ("1990 action"). On April 15, 1993, plaintiff was awarded

summary judgment as to Salco's liability under the 1984 CBA but not the 1987 CBA. *Id.,* 1993 WL 119702 (Apr. 15, 1993 memorandum opinion and order). On July 11, 1995, after proceedings to determine the proper relief for Salco's breaches of the 1984 CBA, judgment was entered against Salco in the amount of $142,114.51. *Id.,* 1995 WL 404863 (July 6, 1995 memorandum opinion and order); Fier Aff., Ex. A. (July 11, 1995 judgment for $142,-114.51). Less than three months later, on October 5, 1995, Salco filed a voluntary Chapter 7 bankruptcy petition, signed by Kevin Catucci as Vice President, in the United States Bankruptcy Court for the Eastern District of New York. Epstein Aff., Ex. A (petition).

On January 22, 1996, plaintiff filed this action against the Catuccis for their alleged roles in the Salco delinquencies originating from April 1, 1984 to March 31, 1990 under both the 1984 CBA and the 1987 CBA. Compl. ¶ 10. Count I (Delinquent Contributions Under ERISA) seeks to pierce the Salco corporate veil to hold the Catuccis liable for the judgment against Salco in the 1990 action under the 1984 CBA as well as for delinquent contributions by Salco under the 1987 CBA. Count II (Breach of ERISA Fiduciary Duty) alleges that Sabato Catucci was a fiduciary of the Fund who used his discretionary control over Salco assets to deny the Fund its contributions from Salco and to benefit himself. Count III (Conversion of Plan Assets) asserts a civil claim for damages resulting from the federal crime of theft or embezzlement from an employee benefit plan. Defendants counterclaim under New York state law for attorney's fees for a prevailing party in an action for fraud, misconduct, and breach of fiduciary duty.

## II. Discussion

### A. Breach of Fiduciary Duty

#### 1. Statute of Limitations

The limitations period for an ERISA fiduciary beach action is:

the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

■ The three-year limitations period applicable once a plaintiff has "actual knowledge of the breach or violation" bars any claims based solely on Salco's failures to meet deadlines between 1984 and 1990 for Fund contributions. By 1990, when plaintiff filed a civil action against Salco for delinquent contributions, it clearly had actual knowledge that Salco, the company that Sabato Catucci controlled, had been in delinquency, and therefore in possession of Fund assets, since 1984, when Salco should have begun making contributions. Because a three-year limitations period beginning in 1990 would end in 1993, well before the filing of this action, any claims against Sabato Catucci for the missed payment deadlines are time-barred.

■ The fact that certain claims are time-barred does not render other similar claims time-barred, however. It was only after the 1995 Salco bankruptcy filing that plaintiff learned of the disputed payments that Salco made after 1990 to other parties than the Fund. *See infra* Part II.A.3. Even if those payments simply perpetuated and exacerbated Salco delinquencies dating back as far as 1984, they were distinct actions that support new fiduciary duty breach claims. Even if all improper payments within the past six years were of the same sort that began to occur in 1984,

each time a fiduciary made an improper payment with Fund assets, "the Fund [was] harmed and a new cause of action arose ..., regardless of [plaintiff's] prior knowledge that they were occurring." *Dole v. Formica,* 14 E.B.C. 1397, No. C87–2955, 1991 WL 317040, at *8 (N.D.Ohio Sep.30, 1991) (finding recurring breaches, not just one initial breach with continuing effects, where fiduciary had fund pay excessive administrative fees and salaries, and had fund collect sub-market rents, for several years).

Accordingly, the court rejects the argument that recurring breaches " 'simply flowed from the ... [initial breach] decision' and did not give rise to new, independent wrongs." *Buccino v. Continental Assur. Co.,* 578 F.Supp. 1518, 1521 (S.D.N.Y. 1983) (holding fiduciaries liable for not divesting fund of improper investments because, being "under a continuing obligation" to reclaim wrongfully placed fund assets, "[t]heir failure to do so gave rise to a new cause of action each time the Fund was injured by its continued possession of individual policies, that is, each time it made a premium payment"); *see also Carollo v. Cement & Concrete Workers Dist. Council Pension Plan,* 964 F.Supp. 677, 688 (E.D.N.Y.1997) (holding that claims against use of improper benefits formula adopted years before filing were not time-barred because the "statute of limitations begins to run each year the fiduciaries maintain the plan in violation of their duties"); *Gruby v. Brady,* 838 F.Supp. 820, 831 (S.D.N.Y.1993) (holding same because, with fiduciaries "under a continuing obligation to ... ensure that benefits payments are not excessive, ... defendants' failure to do so gives rise to a new cause of action each time the Fund was injured, that is, each time excessive benefit payments were made"). While claims based solely on missed payment deadlines between 1984 and 1990 are time-barred, claims based on allegedly improper Salco expenditures of Fund assets are not time-barred.

## 2. Fiduciary Status of Sabato Catucci

Plaintiff argues that Sabato Catucci is a Fund fiduciary because he exercised discretionary control over Salco finances while Salco owed the Fund overdue contributions. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). "This definition requires (1) showing that the plan assets are at issue and (2) that the individual defendants exercised authority or control relating to the management or disposition of such assets." *Maney v. Fischer,* No. 96 Civ. 0561(KMW), 1998 WL 151023, at *4 (S.D.N.Y. Mar.31, 1998); *see also United States v. Glick,* 142 F.3d 520, 527–28 (2d Cir.1998) (same test).

### a. Unpaid Contributions to Fund as "Plan Assets"

■ First in the two-part fiduciary status determination is the question of whether the monies allegedly in the defendant's control were "Fund assets." *Glick,* 142 F.3d at 527. "[W]hen an employer's contribution becomes an 'asset' of a plan must be determined by reference to the rights and obligations created by the underlying wage agreement." *United States v. Panepinto,* 818 F.Supp. 48, 51 (E.D.N.Y. 1993); *see also Maney,* 1998 WL 151023, at *4 (citing *id.*). Salco was in debt to the Fund as of 1984, when it failed to make its first contribution to the Fund. The Fund's "Agreement and Declaration of Trust and Plan," in Article II (entitled, "Assets of the Fund"), provides that "[t]he Fund shall consist of ... (d) money received from or owing from any other person, corporation, or Fund required to make contributions or payments to this Fund ... and (f) interest income, etc., earned on any or all of the above." Fier Aff., Ex. B, at 8.

■ This language makes clear that the monies constituting the Fund include

"money ... owing from any ... corporation ... required to make payments to this Fund." Salco's debt to the Fund, as money owed to the Fund by a corporation required to make payments to the fund, therefore is a Fund "asset." Courts consistently hold that a company's unpaid debt to an ERISA fund is an "asset" of that fund when the applicable agreement declares such debts to be fund assets. *See, e.g., United States v. Lasky*, 967 F.Supp. 749, 754 (E.D.N.Y.1997) (holding that unpaid employer contributions were plan assets where the agreements "clearly establish that the monies given by the employer to [its agent] to be remitted to the [Fund] are [Fund] 'assets' "); *Panepinto*, 818 F.Supp. at 51 (holding same where agreement provided that employer had no legal right to "any sum paid by or *due from the Employer*" (emphasis added)); *Connors v. Paybra Mining Co.*, 807 F.Supp. 1242, 1246 (S.D.W.V.1992) (holding same where agreement provided that "Title to all the monies paid into and/or *due and owing* to the Trusts ... shall be vested in and remain exclusively in the Trustees" (emphasis added)); *Galgay v. Gangloff*, 677 F.Supp. 295, 301 (M.D.Pa.1987) (holding same where agreement provided that "Title to all the monies paid into and/or *due and owing* said Fund shall be vested in and remain exclusively in the trustees" (emphasis added)); *Pension Benefit Guaranty Corp. v. Solmsen*, 671 F.Supp. 938, 943 (E.D.N.Y.1987) (holding that unpaid employer contributions were plan assets); *cf. United States v. LaBarbara*, 129 F.3d 81, 88 (2d Cir.1997) (upholding conviction for theft of employee benefit fund "assets" because "[o]nce wages were paid to Local 66 members, Strathmore had contractual obligations to the Funds that constituted 'assets' of the Funds by any common definition").

Thus, "the language of the ... Agreement, not ERISA, serves as the foundation for the court's finding that the alleged unpaid contributions by defendants are vested assets of the plaintiff fund." *Galgay*, 677 F.Supp. at 302. *Galgay*, a factu-ally similar case, explained this cautionary note as follows:

> the court by no means holds as a general rule that employers may be liable under ERISA as fiduciaries merely because of delinquent contributions to a multi-employer plan. The key to the court's ruling in this situation is the clear and undisputed language of the [Agreement] .... Thus, the unambiguous language of the [Agreement] makes any delinquent employer contributions vested assets of the plaintiff fund.

*Id.* at 301. An agreement that unpaid debts to an ERISA fund become fund assets means that when a corporation is delinquent in its contributions, the fund has a sufficient priority on the corporation's available resources that individuals controlling corporate resources are controlling fund assets. Such agreements may place heavy responsibilities on employers, but only to the extent that, as here, an employer freely accepts those responsibilities in collective bargaining.

### b. Discretionary Authority Over Fund Assets

Second in the two-part fiduciary status determination is the question of whether the defendant had "managerial discretion or control" over the Fund assets. *United States v. Glick*, 142 F.3d 520, 527 (2d Cir.1998). Because courts "have broadly construed what it means to have actual control over the disposition of plan assets, ... '[a]n entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary.' " *Id.* at 527, 528 n. 9 (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir.1987)). Rather, an entity need only have "sufficient control over at least a part of the [plan] assets to create a fiduciary relationship." *Id.* at 528. "In addition, 'a person may be a fiduciary with respect to certain matters but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility.' " *Gray v. Briggs*, 45

F.Supp.2d 316, 328 (S.D.N.Y.1999) (quoting *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir. 1987)) (citing 29 C.F.R. § 2509.75–8 ("The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions, which he or she performs with respect to the plan.")) (other quotations omitted). "Congress intended the term to be broadly construed. '[T]he definition includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title.'... Thus, whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." *Blatt,* 812 F.2d at 812 (quoting H.R.Rep. No. 93–1280, *reprinted in* 1974 U.S.C.C.A.N. 4639, 5038, 5103); *see also Liss v. Smith,* 991 F.Supp. 278, 302 (S.D.N.Y.1998) ("[D]efinition of a fiduciary is functional and focuses on the nature of the duties performed rather than the title held.") (citing *Blatt,* 812 F.2d 810); *PMTA–ILA Containerization Fund v. Rose,* No. Civ. A. 94–5635, 1995 WL 461269, at *4–5 (E.D.Pa. Aug.2, 1995) ("The question is not whether the defendant formally assumed the role of fiduciary[, but] ... whether the person exercised discretionary control or authority over the ERISA plan's assets, administration or management.").

■ Sabato Catucci clearly had managerial discretion and control over all of Salco. During the entire period of Salco's debt to the Fund, he was the corporation's President and controlling shareholder. He ran the corporation and make all decisions on payments by Salco. Pl.'s R. 3(g) Stmt. ¶¶ 6–8. "Once contributions became due and owing, they become plan assets.... The above admissions, with others in the record, demonstrate that [defendant] personally 'exercise[d] ... authority or control respecting management or disposition of' these assets. As a result, [defendant] come[s] within the ERISA definition of fiduciary." *Connors v. Paybra Mining*

*Co.,* 807 F.Supp. 1242, 1246 (S.D.W.V.1992) (alteration of internal quotation in original). *Pension Benefit Guaranty Corp. v. Solmsen,* 671 F.Supp. 938 (E.D.N.Y.1987) found fiduciary status in a similar setting. Jerry Solmsen was the president and sole owner of a defunct corporation whose debt to an ERISA plan was a plan asset. In finding that he had the requisite control over plan assets, the court first noted that he had signed contracts governing the plan, and then emphasized that "[m]ost significantly, defendant was responsible for authorizing and making payments to the Plan.... [H]e exercised discretion in declining to authorize and make payments when the bank balance was not 'sufficient.' These acts show defendant's discretionary authority as to the management and administration of the Plan and the disposition of its assets." *Id.* at 944–45.

With *Pension Benefit Guaranty* among the regularly-cited precedents, "[c]ourts have consistently held that employers who exercise discretionary control over funds that are designated for deposit into an ERISA fund qualify as fiduciaries," including individuals managing corporations obliged make fund contributions. *PMTA–ILA Containerization Fund,* 1995 WL 461269, at *5. *See, e.g., id.* (president and CEO of Northern, the corporation in debt to the fund, who "exercised discretionary control over all of Northern's assets, ... made the final decision on how to distribute Northern's revenues and royalties, [and made the] ... decision to either pay the accrued contributions to the Fund, or use the *container royalties* to meet other obligations"); *Connors,* 807 F.Supp. at 1246 (individuals who, as officers, directors, and sole shareholders of corporations in debt to ERISA funds, "exercised broad personal discretion and control over the assets and spending practices of the corporat[ions,] ... [and] decisions on which bills to pay and ... which of those bills were being delayed to pay.... Contributions due and owing the Funds were withheld and directed elsewhere and such spending decisions were the personal, con-

scious choices of these Defendants."); *cf. Galgay v. Gangloff,* 677 F.Supp. 295, 301 (M.D.Pa.1987) (corporations that were in debt to fund, although they exercised no authority over fund besides controlling their own monies while in debt to fund).

In light of this case law, Sabato Catucci's dominant role in Salco establishes that "[b]ecause [he] had discretionary control over money that was 'due and owing' to the Fund, i.e. plan assets, he was an ERISA fiduciary." *PMTA–ILA Containerization Fund,* 1995 WL 461269, at *5. Any reasonable fact finder would conclude Sabato Catucci was a fiduciary of the Fund to the extent of Salco's delinquent contributions. Consequently, a fiduciary duty to the Fund should have guided his management of Salco monies once Salco was in debt to the Fund.

### 3. Breach of Fiduciary Duty by Sabato Catucci

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence ... that a prudent man ... would use." 29 U.S.C. § 1104(a)(1),(a)(1)(B). Relevant specific duties are that a fiduciary: shall ensure that "assets of the plan never inure to the benefit of the employer and shall be held for the exclusive purposes of providing benefits to participants in the plan," 29 U.S.C. § 1103(c)(1); "shall discharge his duties with respect to a plan solely in the interests of the participants," 29 U.S.C. § 1104(a)(1); and shall not use plan assets in any transaction with "a party in interest," 29 U.S.C. § 1106(a)(1), nor "in his own interest or for his own account," 29 U.S.C. § 1106(b)(1). The statute provides that "any person who is a fiduciary" and who breaches his fiduciary obligations "shall be personally liable to make good to such plan any losses to the plan." 29 U.S.C. § 1109(a).

#### a. Payments of Salco Expenses

 Sabato Catucci violated his duty as a Fund fiduciary similarly to the defendant in *Pension Benefit Guaranty Corp. v. Solmsen,* 671 F.Supp. 938 (E.D.N.Y.1987). "Defendant allocated available monies to corporate expenses rather than the ... fund, thereby breaching his duty to act solely in the interests of the Plan's participants ... in violation of 29 U.S.C. §§ 1104(a)(1) and 1103(c)(1). Because he was also the sole shareholder of the corporation, defendant dealt with the plan assets in his own account in violation of 29 U.S.C. § 1106(b)(1)." *Id.* at 946; *see also PMTA–ILA Containerization Fund v. Rose,* No. Civ. A. 94–5635, 1995 WL 461269, at *5 (E.D.Pa. Aug.2, 1995) ("[Defendant] failed to pay that money into the Fund even after his obligation accrued. Instead, he intentionally used the [unpaid contributions] to meet other company obligations," in violation of §§ 1103(c)(1), 1104(a)(1)); *Connors v. Paybra Mining Co.,* 807 F.Supp. 1242, 1246 (S.D.W.V.1992) ("Fund assets, in the form of due and owing contributions, were either diverted for other purposes or simply not paid as a result of [defendants'] personal, discretionary control and management.... Because [defendants] failed to act 'solely in the interest of the participants and beneficiaries' of the Fund, ... they breached their fiduciary duty.").

Such violations may seem difficult to avoid when the corporation is in debt to the Fund because virtually any bills the corporation pays may be deemed uses of Fund assets. That is what the corporation and its controlling persons bargained for, however, when they agreed that unpaid contributions be deemed Fund assets. A ruling otherwise would improperly rewrite a collective bargaining agreement in a way that deprives one party, the Fund, of a useful debt collection procedure that the other party—the employer and its privies, agents, and controlling persons—freely agreed upon in a bargaining process that balanced both sides' benefits and detriments.

The applicable agreements and ERISA precedents therefore compel a finding that

Sabato Catucci is personally liable under 29 U.S.C. § 1109(a) for violating statutory guidelines for ERISA fiduciaries, 29 U.S.C. §§ 1103(c)(1), 1104(a)(1), 1106(b)(1). Any reasonable fact finder would conclude that Sabato Catucci used Salco monies that were due to the Fund, and therefore were Fund assets, for the benefit of Salco, the corporation in which he had a majority interest and ultimate authority, in violation of ERISA prohibitions.

### b. Payments Benefitting Sabato Catucci in Particular

Plaintiff further alleges that Sabato Catucci engaged in self-dealing with some of the Salco payments, specifically in Salco transactions with Sabato Catucci and American Stevedoring, Inc. that Salco appears to have described at the time as loans. Pl.'s R. 3(g) Stmt. ¶¶ 27–28 (two January 23, 1994 checks from Salco to Sabato Catucci, both signed by Ronald Catucci, one for $25,192 for "repayment of Principle loan" and one for $9,179 for "repayment of interest 8/89—1/94"); *id.* ¶¶ 32, 36 (April 30, 1992 check from Salco to American Stevedoring, signed by Ronald Catucci, for $40,000; October 5, 1995 Salco bankruptcy petition listing of 1994 Salco interest income on loan transactions with American Stevedoring); Epstein Aff., Ex. E (page marked on October 31, 1996 as "Plaintiff's Exhibit No. 24 for Identification" showing the two Salco checks to Sabato Catucci). Plaintiff alleges, but defendants deny, that American Stevedoring, Inc. also is a family business of the Catuccis controlled by Sabato Catucci. Pl.'s R. 3(g) Stmt. ¶ 29; Defs.' Resp. to Pl.'s R. 3(g) Stmt.

■ The payments to Sabato Catucci violated 29 U.S.C. § 1106(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." *See Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1214 (2d Cir.1987) (holding § 1106(b)(1) violated when defendants "invested assets of the Plans in companies in which defendants owned a substantial equity interest,"

including ones they "substantially owned and controlled"). The payments to Sabato Catucci also violated 29 U.S.C. § 1106(a)(1)(D), which prohibits a fiduciary from making any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." *See Gray v. Briggs,* 45 F.Supp.2d 316, 326 (S.D.N.Y. 1999) (holding fund fiduciary to be "party in interest" to fund (citing 29 U.S.C. § 1002(14))); *Liss v. Smith,* 991 F.Supp. 278, 291 (S.D.N.Y.1998) (holding employer to be "party in interest" to fund (citing 29 U.S.C. § 1002(14)(C))).

Any reasonable fact finder would conclude that Sabato Catucci dealt with Fund assets in his own interest and for his own account, in violation of 29 U.S.C. § 1106(b)(1), and had Fund assets transferred to, and used by and for the benefit of, himself, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D). The payments to American Stevedoring, Inc. would violate ERISA identically to the extent that plaintiff produces the evidence purporting to show Sabato Catucci's stake in that corporation. Pl.'s R. 3(g) Stmt. ¶¶ 29–30 (citing deposition testimony of Kevin Catucci as source of information on ownership of American Stevedoring).

### 4. Fiduciary Status of Kevin Catucci, Keith Catucci, and Ronald Catucci

Plaintiff's complaint focuses on the allegation that Sabato Catucci was a fiduciary but also seeks to hold Kevin Catucci, Keith Catucci, and Ronald Catucci liable for breach of fiduciary duty. *E.g.,* Compl. ¶ 29 (alleging that under ERISA provision for "Liability for breach of fiduciary duty," 29 U.S.C. § 1109, "Sal Catucci *and the Catuccis* are personally liable to make good to the Fund any and all losses resulting from his breach of fiduciary duty" (emphasis added)). As against Kevin Catucci, Keith Catucci, or Ronald Catucci, such a claim could prevail only if the defendant was either a fiduciary or a non-fiduciary "who knowingly participate[d] in an ERISA fiduciary's breach of duty," *Diduck v. Kasz-*

*ycki & Sons Contractors, Inc.*, 974 F.2d 270, 281 (2d Cir.1992); *see also Liss v. Smith,* 991 F.Supp. 278, 304 (S.D.N.Y. 1998) (noting that *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), may limit non-fiduciary "knowing participation" claims to equitable relief).

■ Plaintiff's showing of Sabato Catucci's control over Salco, however, disproves any argument that Kevin Catucci, Keith Catucci, or Ronald Catucci had sufficient control to support a finding of either fiduciary or non-fiduciary liability. The marginal roles that Kevin Catucci, Keith Catucci, and Ronald Catucci played in any Salco matters were well below the threshold of "managerial discretion or control," *United States v. Glick,* 142 F.3d 520, 527 (2d Cir.1998), required to render them Fund fiduciaries. Those roles similarly were too slight to meet the standard for "knowing participation" in any wrongdoing by Sabato Catucci.

> One participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed.... Whether the aid rendered is "enough" to warrant the imposition of liability is essentially a proximate cause inquiry. Thus, though but for causation is not sufficient, liability may attach for acts or omissions that are a "substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."

*Diduck,* 974 F.2d at 284 (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23–24 (2d Cir.1990)) (other citations omitted). The reason that Sabato Catucci was a fiduciary is that his power over Salco was complete; he was the only true decision-maker in all Salco actions, including those touching Fund assets. Any reasonable fact finder would conclude that Kevin Catucci, Keith Catucci, and Ronald Catucci all lacked sufficient control over Salco's actions to have been Fund fiducia-ries or to have been but-for causes of, or substantial factors in, any breaches of fiduciary duties to the Fund.

### B. Delinquent Contributions

#### 1. Procedural Barriers to Plaintiff's Claims

##### a. Federal District Court Jurisdiction

■ On the Count I claims seeking to hold defendants personally liable for the delinquent Salco contributions, plaintiff argues for application of New York law on piercing the corporate veil (Pl.'s Mem. at 5–7) while defendants argue for dismissal based on the impermissibility of a state law claim in a field pre-empted by federal law (Defs.' Mem. at 14–16). The Second Circuit explicitly has held that ERISA, while pre-empting state law on piercing the corporate veil, allows the essence of such a claim to be brought under federal law. *Romney v. Lin,* 94 F.3d 74 (2d Cir. 1996), a fund's effort to recover delinquent contributions from the corporation's controlling persons, held that federal ERISA standards pre-empt N.Y. Bus. Corp. L. § 630, the state statute that otherwise allows shareholder liability for corporate debts to employees. A claim for personal liability against the delinquent corporation's controlling persons therefore is properly in federal court based on federal law that pre-empts any otherwise applicable state law. Moreover, contrary to defendants' argument that any "veil-piercing" claims belong in Salco bankruptcy proceedings (Defs.' Mem. at 20–22), the Count II claims neither belong to, nor are brought against, the debtor corporation. Rather, as claims by the Fund against the Catuccis arising under federal law, they are properly brought in federal district court.

##### b. Statute of Limitations

■ Despite pre-emption, the most analogous state statute of limitations applies to all ERISA actions for delinquent contributions. *See O'Hare v. Gen'l Ma-*

*rine Transp. Corp.,* 740 F.2d 160 (2d Cir. 1984). Momentarily ignoring the veil-piercing element, the applicable limitations period for an ERISA delinquent contributions action is the six-year New York limitations period for breach of contract claims. *See id.* By much the same analysis as for the fiduciary duty claims, the delinquent contributions claims would be within that period because key events in the alleged disregard of the corporate form occurred in the 1990s and, regardless of when they initially occurred, were concealed from plaintiff until the 1995 Salco bankruptcy filing. *See supra* Part II.A.4. To the extent that the veil-piercing element of the delinquent contributions claims makes it more appropriate to apply New York's limitations period for piercing the corporate veil, the claims are well within that twenty-year period. *See Solow v. Domestic Stone Erectors, Inc.,* 229 A.D.2d 312, 645 N.Y.S.2d 17 (1st Dept.1996) (citing N.Y. C.P.L.R. § 211(b)).

### c. Preclusion Based on the 1990 Action Against Salco

▮ The delinquent contributions claims against defendants are not precluded by the 1990 delinquent contributions action against Salco because none of the present claims were a "ground of recovery that was available in the prior action." *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 62 (2d Cir.1989). The alleged disregard of the corporate form was concealed from plaintiff until the 1995 Salco bankruptcy filing, which did not occur until after the judgment in the 1990 action. To the extent that the present claims are merely efforts to enforce the prior judgment against Salco, then they could not have been brought until after the judgment. To the extent that the present claims are separate from the 1990 action, rather than an effort to enforce the judgment in that action, then they could not have been brought with the 1990 claims because many key facts supporting the present claims (e.g., the 1992 and 1994 payments allegedly constituting injurious

disregard for the corporate form) had not yet occurred and other key facts were hidden from plaintiff until 1995. Thus, no present claims are precluded by the 1990 action.

### 2. Alter Ego ERISA Liability

▮ "An individual cannot be held 'liable for corporate ERISA violations solely by virtue of his role as officer, shareholder, or manager.' Beyond his status within the corporate structure, the ... court must examine the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo,* 35 F.3d 29, 33 (2d Cir.1994) (quoting *Sasso v. Cervoni,* 985 F.2d 49, 50 (2d Cir.1993)). Even an individual defendant who, as the sole officer, director, and shareholder, enjoys a "dominant role in the affairs of a corporate employer" will not be liable for the corporation's delinquent fund contributions where "[h]e did not act in concert with a fiduciary to breach a fiduciary obligation, he did not commit fraud, and there is no claim and no basis in the record to support a claim that the corporate veil ... should be breached on the theory that [defendant] is the corporation or its alter ego." *Sasso,* 985 F.2d at 51 (reversing judgment imposing personal liability on individual defendant).

The question is whether "special circumstances, beyond an individual's officer status or corporate duties, might warrant the imposition of personal liability for a corporation's ERISA obligations." *Sasso,* 985 F.2d at 50 (citing *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209 (2d Cir. 1987); *Leddy v. Standard Drywall, Inc.,* 875 F.2d 383 (2d Cir.1989)). The defrauding of an ERISA fund by a corporate official is one such basis for personal liability. Refusing to "[s]hield[ ] from liability a controlling corporate official who ... deliberately flouts ERISA obligations by con-

spiring to defraud" benefit funds, the Second Circuit in *Leddy* held that "to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable" under ERISA. 875 F.2d at 388.

■■■■ More generally, disregard of the corporate form so as to work injustice warrants "alter ego" personal liability for individuals who caused corporations they control to become delinquent in meeting their ERISA fund obligations. In *Lowen*, a seminal case on alter ego liability for corporate ERISA delinquency, the Second Circuit imposed personal liability on the individual who controlled both the delinquent corporation and related companies, noting that "[c]ourts have without difficulty disregarded corporate form for substance where ERISA's effectiveness would otherwise be undermined." 829 F.2d at 1220 (citing *Alman v. Danin*, 801 F.2d 1 (1st Cir.1986) (holding individuals liable for corporate pension contributions)). Personal liability typically attaches to an individual who caused the ERISA delinquency of a "marginal corporation" that he left undercapitalized, improperly intertwined with other of his ventures, and failed to support with proper corporate records. *Alman*, 801 F.2d at 4.

### 3. Alter Ego Liability of Sabato Catucci

■■ As to Sabato Catucci, the facts supporting the breach of fiduciary duty claim also support a claim that he is personally liable for Salco's delinquent contributions as the corporation's alter ego. Plaintiff's evidence clearly shows that Sabato Catucci dominated Salco. That alone is insufficient for alter ego liability, but the evidence could support further findings that would be sufficient. Specifically, plaintiff could prove that Sabato Catucci ran Salco not as a distinct corporate entity, but as a personal venture aiming for personal financial gain, with Salco making payments benefitting Sabato Catucci dur-

ing the years it neglected its Fund obligations. Failure to maintain Salco as a distinct corporate entity is evidenced further by the near-complete lack of corporate records during the roughly 22 years when Sabato Catucci controlled Salco. The only such records produced from that period were three stock certificates and one page of shareholder meeting minutes, all dated January 5, 1988 and all documenting the entry of Kevin Catucci and Keith Catucci into Salco on that day. Pl.'s R. 3(g) Stmt. ¶¶ 9–11; Epstein Aff., Ex. B (certificates and minutes). Although a small, family-operated corporation need not observe all the formalities of a large, diffusely-owned corporation, the record-keeping failures here have had harmful effects, *e.g.*, the Catuccis' professed ignorance regarding Salco transactions with American Stevedoring, Inc., another company allegedly dominated by Sabato Catucci. Pl.'s R. 3(g) Stmt. ¶¶ 32–34 (Sabato Catucci and Kevin Catucci denying knowledge of Salco–American Stevedoring loan transactions documented in Salco bankruptcy petition they filed).

*Lowen* found alter ego liability appropriate in a similar context. "The individual defendants were in no way passive investors in the corporate defendants. They personally and actively controlled and dominated those firms," disregarding the corporate form to their own benefit and to the fund's detriment. 829 F.2d at 1221. The individual defendants engaged in

> extensive intermixing of assets among the corporations, and among the corporations and individual defendants, without observing the appropriate formalities, ... and wholly inadequate capitalization of the corporations in light of the nature of the businesses in which they were engaged. The individual defendants caused [one corporation] to invest in companies in which they, their close relatives, [or related corporations] had an equity interest[,] ... then took these proceeds for themselves in the form of salaries, bo-

nuses and unsubstantiated travel and expense reimbursements, and left the corporate defendants with virtually no net worth.

*Id.* The details of the suspect Salco transactions are sufficiently cloudy that the court cannot say what a reasonable fact finder would conclude on the elements necessary to impose alter ego liability on Sabato Catucci. Plaintiff's evidence is sufficient to allow at trial, but not to compel at this stage, a finding that Sabato Catucci acted as the alter ego of Salco.

### 4. Alter Ego Liability of Kevin Catucci, Keith Catucci, and Ronald Catucci

■ As to Kevin Catucci, Keith Catucci, and Ronald Catucci, the facts absolving them of fiduciary liability also absolve them of alter ego liability. Just as each had too little control over Salco to have participated in any fiduciary duty breaches with Fund assets, each had too little control over Salco to be deemed its alter ego. *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs., Fund & Annuity Fund v. Lollo,* 35 F.3d 29 (2d Cir.1994), featured a similar context: alter ego delinquent contributions claims against corporate officers who were relatives of Anthony Lollo, the family patriarch who ran the delinquent corporation. The Second Circuit reversed a summary judgment finding of alter ego liability against Steven Lollo, a corporate officer and Anthony Lollo's son, because to the extent "that operational control of the family company lay elsewhere," Steven Lollo would not be "a controlling corporate official" *Id.* at 33. The undisputed evidence here proves the facts that the Second Circuit saw as sufficient for Steven Lollo to avoid alter ego liability. As to each Catucci family member other than the father who actually controlled the business, the evidence shows "that he had no decisional authority over payment of ERISA contributions, ... that he could only sign checks with the direction and consent of [the] father[,] that he did not have the authority to direct payment to

the plaintiff" and therefore that he was not a "controlling corporate official." *Id.* (internal quotation marks omitted). The minority shareholder positions of Kevin Catucci and Keith Catucci added no meaningful quantum of power to their corporate offices. Any reasonable fact finder would conclude that Kevin Catucci, Keith Catucci, and Ronald Catucci all lacked sufficient control over Salco to be liable as alter egos of Salco.

### C. Conversion of Fund Assets (Count III)

■ Count III present civil claims to redress violations of a federal penal statute. Under 18 U.S.C. § 664, "[t]heft or embezzlement from employee benefit plan[s]" is a crime punishable by "fine[,] ... imprison[ment] not more than five years, or both." The short statutory text explicitly provides for criminal penalties but not for a private civil cause of action against violators. Plaintiff argues that: (1) defendants violated 18 U.S.C. § 664; (2) "inasmuch as a violation of [ERISA] fiduciary duties give[s] rise to a civil cause of action, it would follow that a violation of 18 U.S.C. § 664 also gives rise to a civil damage action"; and (3) "no reported case has been found to the effect that § 664 does not authorize a private cause of action." Pl.'s Mem. at 3. Any § 664 civil action largely would overlap ERISA, with a looser duty requirement, *see United States v. Grizzle,* 933 F.2d 943 (11th Cir. 1991) (§ 664 covers "any person," not just a fiduciary), but stricter intent and custody requirements, *see United States v. Andreen,* 628 F.2d 1236 (9th Cir.1980) (§ 664 requires that a defendant have criminal scienter and "custody" of the assets). In the only sort of case that would support a § 664 civil action but not an ERISA civil action—clear theft by a non-fiduciary fund custodian—a non-statutory civil action would seem sufficient. In the absence of case law or legislative history indicating that Congress intended to create such a redundant new civil cause of action, the

court declines to entertain any civil claims under 18 U.S.C. § 664 and therefore dismisses Count III.

III. Conclusion

For the reasons given above, the court grants in part and denies in part both parties' summary judgment motions. As to defendant Sabato Catucci, the court grants plaintiff summary judgment on Count II, grants defendant summary judgment on Count III, and denies both parties summary judgment on Count I. As to defendants Kevin Catucci, Keith Catucci, and Ronald Catucci, the court grants defendants summary judgment on all counts. Accordingly, as against defendants Kevin Catucci, Keith Catucci, and Ronald Catucci, the case will be dismissed. As against defendant Sabato Catucci, Count I will proceed to trial while Count II, with liability already determined, will proceed to a determination of the extent of damages and other appropriate relief.